## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KATIE PREVATTE, daughter and Personal Representative of the Estate of Deceased, MARVELL SOSA** | **Case No.** |
| **Plaintiffs** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **EL DORADO OPERATORS, LLC D/B/A EL DORADO CARE AND REHABILITATION**<br>**Serve:**<br>C T Corporation System<br>112 SW 7th Street Suite 3C, Topeka, KS 66603 | |
| **WINDWARD HEALTH PARTNERS LLC**<br>**Serve:**<br>NRAI Services, Inc<br>1200 South Pine Island Rd.<br>Plantation, FL 33324 | |
| **MISSION HEALTH COMMUNITIES, LLC**<br>**Serve:**<br>NRAI Services, Inc<br>1200 South Pine Island Rd.<br>Plantation, FL 33324 | |
| **CORONADO OPERATOR, LLC**<br>**Serve:**<br>C T Corporation System<br>112 SW 7TH Street Suite 3C, Topeka, KS 66603 | |
| **STUART LINDEMAN**<br>**Serve:**<br>5716 S 1ST St. TAMPA, FL 33611-4404 | |
| **Defendants.** | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

The Plaintiffs, by and through undersigned counsel, submit this Complaint for Damages against the above-named Defendant, and in further support, states and alleges as follows:

## PLAINTIFF

1.      Plaintiff Katie Prevatte is the adult daughter of Marvell Sosa, deceased, and is the duly appointed Representative of the Estate of Marvell Sosa.

2.      Plaintiff is a Resident of Kansas.

3.      Marvell Sosa ("Resident"), was born May 19, 1952, and died on February 26, 2024, from an avoidable pressure injury causing sepsis and resulting in her death.

4.      At all times relevant to this Complaint, Ms. Sosa was a resident of El Dorado Care and Rehabilitation, a skilled nursing facility located at 900 Country Club Ln, El Dorado, KS 67042.

5.      Plaintiff is the duly appointed administrator of the Estate of Marvell Sosa pursuant to a District Court Order from Sedgwick County, KS, appointing Katie Prevatte the Administrator on August 26, 2024, case number SG-2024-PR-001246.

## DEFENDANTS

6.      Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

## EL DORADO OPERATORS, LLC D/B/A EL DORADO CARE AND REHABILITATION ("EL DORADO")

7.     At all times relevant, EL DORADO was a Florida limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as EL DORADO ("Facility" or "the Facility") located at 900 Country Club Ln, El Dorado, KS 67042.

8.     As such, El Dorado was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

9.     Consequently, El Dorado owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

10.     The sole member of El Dorado is Stuart Lindeman.

11.     Stuart Lindeman is a citizen of Florida.

12.     Thus, El Dorado is a citizen of Florida.

## CORONADO OPERATOR, LLC

13.     At all times relevant to this action, Defendant Coronado Operator, LLC ("Coronado Operator") was a Florida company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

14.     At all times relevant, Coronado Operator and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

15.    Coronado Operator and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the administrator; and

    d.  Training and supervising nursing staff persons.

16.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

17.    Consequently, Coronado Operator owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

18.    The sole member of Coronado Operator is Stuart Lindeman.

19.    Stuart Lindeman is a citizen of Florida.

20.    Thus, Coronado Operator is a citizen of Florida.

## WINDWARD HEALTH PARTNERS LLC

21.    At all times relevant to this action, Defendant Windward Health Partners LLC ("Windward Health Partners") was a Florida limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

22.    At all times relevant to this action, Windward Health Partners, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility:

Windward Health Partners, a Tampa-based private investment and holding company, announces its portfolio company, Mission Health Communities, has taken over 14 skilled nursing facilities in the state of Kansas. This transaction represents the fifth portfolio company managed under the Mission Health umbrella.

The Kansas State Department for Aging and Disability Services (KDADS) supported Mission Health Communities' takeover of the facilities and worked closely with the company, the property owners, and Windward Health Partners to obtain an expedited license transfer and integrate operations of the 14-facility, 700 employee acquisition in 45 days.

"We're thrilled with the quick turnaround we were able to achieve in transferring key personnel and operational responsibilities of these facilities, and we look forward to making the needed improvements and upgrades to better serve the residents and their community," said Stuart Lindeman, CEO of Mission Health.

Mission Health Communities now manages a total of 32 companies and has grown from just 13 communities in 2010 to 32 today. The addition of the Kansas portfolio brings Mission Health Communities to operations in six states.

"This transaction continues the expansion of Windward portfolio and adds to our breadth of experience in the healthcare market," said Scott Feuer, co-founder of Windward Health Partners.

Bryan Crino, cofounder of Windward Health Partners, is excited about the prospects for bringing the Kansas portfolio into the team's operating infrastructure. "Moving forward, we'll rely on our track record and experience guiding companies through major transitions to help Mission Health execute on its strategy of servicing its residents and the healthcare community."

https://www.prnewswire.com/news-releases/mission-health-communities-a-portfolio-company-of-windward-health-partners-takes-over-operation-of-14-skilled-nursing-facilities-in-state-of-kansas-300069063.html

23.    Windward Health Partners, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of the facility leadership.

24.    It was Windward Health Partners intention to cut operating expenses at the Facility through cutting of labor expenses while increasing revenue through increased census.

25.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

26.    Consequently, Windward Health Partners owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Petition.

27.    The members of Windward Health Partners Scott Feuer and Bryan Crino.

28.    Scott Feuer and Bryan Crino is each a citizen of Florida.

29.    Thus, Windward Health Partners is a citizen of the state of Florida.

### MISSION HEALTH COMMUNITIES, LLC ("MISSION HEALTH COMMUNITIES")

30.    At all times relevant to this action, Defendant Mission Health Communities, LLC ("Mission Health Communities") was a Florida limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

31.    At all times relevant to this action, Mission Health Communities, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

32.     Mission Health Communities, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of the facility leadership.

33.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

34.     Consequently, Mission Health Communities owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Petition.

35.     The sole member of Mission Health Communities is Stuart Lindeman.

36.     Stuart Lindeman is a citizen of Florida.

37.     Thus, Mission Health Communities is a citizen of Florida.

## STUART LINDEMAN

38.     EL DORADO, or somone on its behalf represcentted to the United States Centers for Medicare and Mediciaid Services ("CMS") that Stuart Lindeman exercised operational and/or managerial control over EL DORADO.

39.     CMS Form 855a — The Medicare Enrollment Application — required EL DORADO to report to the federal government any entity that "exercises operational or managerial control over the provider or conducts the day- to-day operations of the provider, is a managing organization and must be reported." Any individual or entity exercising operational or managerial control over Facility were responsible for ensuring the deviations of the of the standard of care described above did not occur.

40.     Here, EL DORADO reported to CMS that Stuart Lindeman exercised operational or managerial control over the facility during Resident's residency.

41.     Stuart Lindeman was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, EL DORADO by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of EL DORADO

42.     These actions and decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

43.     Moreover, Stuart Lindeman operated, managed, maintained, and/or controlled EL DORADO by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of EL DORADO that could and should have been utilized to hire enough nursing staff.

44.     These actions and business decisions had a direct impact on the care provided to all residents including Resident and caused the injuries at issue in this lawsuit.

45.     Stuart Lindeman knowingly participated in the tortious conduct at issue in this case.

46.    Consequently, Stuart Lindeman owed a duty to Resident to use reasonable care for Resident's safety while under his care and supervision at EL DORADO.

## EL DORADO, CORONADO OPERATOR; WINDWARD HEALTH PARTNERS; STUART LINDEMAN; AND MISSION HEALTH COMMUNITIES' JOINT ENTERPRISE/VENTURE

47.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

48.    Defendants EL DORADO, Coronado Operator; Windward Health Partners; Stuart Lindeman; and Mission Health Communities ("Joint Venture Defendants") were engaged in a joint venture in that:

a. The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, a Kansas licensed skilled nursing facility;

b. The Joint Venture Defendants had had a common purpose to operate the Facility, a Kansas licensed skilled nursing facility;

c. The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, a Kansas licensed skilled nursing facility; and

d. The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, a Kansas licensed skilled nursing facility.

e. There has been always a close relationship between the Joint Venture Defendants relevant.

49.    Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

## JURISDICTION AND VENUE

50.     Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

51.     Each member of each defendant are citizens of the Florida.  Thus, each defendant is a citizen of Florida.

52.     Plaintiff is a citizen of Kansas.

53.     Decedent was a citizen of Kansas at the time of her death.

54.     The estate of Marvell Sosa is a citizen of Kansas.

55.     Therefore, Plaintiff brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

56.     Pursuant to K.S.A. § 60-308(b)(2), defendants. purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing entering into contracts with entities in Kansas that then permitted them to commit tortious acts within the state including, but not limited to, failing to ensure that El Dorado had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

57.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

## AGENCY

58.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

59.    The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendant and were performed either with the full knowledge and consent of Defendant, and/or were performed by its agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendant.

60.    Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendant were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

61.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

### EL DORADO, CORONADO OPERATOR; WINDWARD HEALTH PARTNERS; STUART LINDEMAN; AND MISSION HEALTH COMMUNITIES' TREATMENT OF RESIDENT

62.    Upon information and belief, Resident was at risk for developing pressure injuries.

63.    On or about August 8, 2023, Ms. Sosa suffered blunt force injuries to her head during an assault at her residence in Wichita, KS. As a result of these injuries, Ms. Sosa suffered traumatic brain injuries with loss of consciousness, which led to her requiring a tracheostomy and developing quadriplegia.

64.    Following hospitalization and rehab as Select Specialty Hospital, Ms. Sosa was admitted to El Dorado Care and Rehabilitation on or about January 4, 2024, for skilled nursing care, rehabilitation, and assistance with daily living.

65.    At the time of her admission, Ms. Sosa diagnoses included: Diffuse traumatic brain injury with loss of consciousness; Quadraplegia; Tracheostomy ; Confirmed adult physical abuse; Paroxysmal atrial fibrillation; Type 2 diabetes mellitus; Moderate protein-calorie malnutrition; Skull fracture; Central sleep apnea; Uninhibited neuropathic bladder; Atherosclerotic cardiovascular disease; and Chronic kidney disease

66.    Upon admission to the Facility, Ms. Sosa was assessed to be at high risk for the development of pressure ulcers due to her quadriplegia, decreased mobility, history of traumatic brain injury, malnutrition, and diabetes.

67.    Upon information and belief, despite Resident's risk for developing pressure injuries, none of the Facility staff created a Care Plan for resident that implemented the appropriate interventions.

68.    Upon information and belief, none of the Facility staff implemented or applied the appropriate interventions to address Resident's risk of developing pressure injuries.

69.    Upon information and belief, from admission to his discharge, none of the Facility staff:

      a.    Properly assessed Resident's risk of developing pressure injuries;

      b.    Implemented or provided the appropriate interventions to prevent Resident from an avoidable Pressure injury, including appropriate supervision and Pressure injury preventions;

    c. Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d. Monitored Resident's condition, including Resident's risk for developing an avoidable Pressure injury during this time frame.

    e. repositioned Ms. Sosa at appropriate intervals.

    f. provided appropriate pressure relieving devices and surfaces

    g. provided adequate nutrition and hydration to promote skin condition.

70. Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

71. Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

72.    Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable Pressure injury, or monitor and adequately supervise Resident's condition.

73.    As a direct and proximate result of Defendant's failures, Ms. Sosa developed a severe pressure injury that became infected, leading to sepsis.

74.    Defendants failed to properly assess and address Ms. Patton's nutritional needs, as evidenced by records indicating that she often consumed little to nothing during meals and suffered from moderate protein calorie malnutrition.

75.    Defendants failed to implement Ms. Sosa's diet orders as evidenced by records indicating she was provided food with inappropriate textures despite her swallowing difficulties and tracheostomy.

76.    On or about February 19, 2024, Ms. Sosa was transferred to Ascension Via Christi St. Francis Hospital with sepsis due to an infected pressure injury.

77.    Ms. Sosa died on February 26, 2024. According to her death certificate, the cause of death was sepsis due to infected decubitus ulcer, which was a complication from blunt force trauma to the head sustained in an assault.

## Undercapitalization/Underfunding at the Facility

78.     Stuart Lindeman; Windward Health Partners, Coronado Operator; Mission Health Communities; and EL DORADO had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

79.     Stuart Lindeman; Windward Health Partners, Coronado Operator; Mission Health Communities; and EL DORADO had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

80.     Upon information and belief, EL DORADO had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

81.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

82.     Transactions directed by Windward Health Partners, Stuart Lindeman; Coronado Operator; And Mission Health Communities; left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

**Legal Basis for Windward Health Partners, Stuart Lindeman; Coronado
Operator; and Mission Health Communities' Liability**

83.    Windward Health Partners, Stuart Lindeman; Coronado Operator; and
Mission Health Communities are collectively referred to herein as the "Corporate
Defendants."

84.    The Corporate Defendants directed, operated, and managed the day-to-
day functions of their skilled nursing facilities – including the Facility – by
developing and implementing policies, practices and procedures affecting all facets
of the Facility, including resident care.

85.    These policies manipulate and control the physical and financial
resources and prohibit decision making at the Facility level.

86.    This directly affects resident care by determining things such as what
type and quality of nourishment is available for residents; what safety measures may
and may not be used depending upon cost; the integrity of the building itself; and
most importantly, how much staff is available to provide resident care and how well
trained and supervised are the staff to meet the needs of the residents.

87.    The Corporate Defendants affirmatively chose and decided to establish
such operations and demand they be implemented.

88.    Upon information and belief, such operations included the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

89.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

90.    The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

   a. The shared interest in the operation and management of skilled nursing facilities;

   b. The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

   c. The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing skilled nursing facilities.

91.    Kansas law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

92.    The Corporate Defendants share a common interest in the operation and management of skilled nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of skilled nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing skilled nursing facilities for profit.

93.    The Corporate Defendants and EL DORADO took direct, overt, and specific actions to further the interest of the joint enterprise.

94.    These actions were taken through a joint venture/enterprise or through the Corporate Defendants and EL DORADO's officers, directors, managers and or employees.

95.    The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

96.    Further, because the Corporate Defendants and EL DORADO were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of the Facility.

**Direct Participation/Individual Actions**

97.    The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of skilled nursing facilities throughout Kansas and the country. One such skilled nursing facility was the Facility where Resident was admitted for care and treatment.

98.    At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their skilled nursing facilities – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the skilled nursing facilities; and, (3) payor mix.

99.    At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendants determined:

     a.  The number of staff allowed to work in their chains of skilled nursing facilities including the Facility;

     b.  The expenditures for staffing at the skilled nursing facilities including the Facility;

     c.  The revenue targets for each skilled nursing facilities including the Facility;

     d.  The payor mix, and census targets for each skilled nursing facilities including the Facility;

     e.  Patient recruitment programs and discharge practices at each skilled nursing facilities including the Facility.

100.    All cash management functions, revenues and expenditure decisions at the skilled nursing facilities level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

101.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

102.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

103.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

104.    Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

105.    Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

106.    Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

107.    The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

108.    At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

109.    In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed skilled nursing facility, in this case the Facility, by the State of Kansas.

## Corporate Malfeasance

110.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

111.    Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

112.    These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and the Facility.

113.    Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury. This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

114.    During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating the Facility.

115.    During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above. Ultimately, Resident died because of this failure.

116.    The Corporate Defendants manage, operate, and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiffs for the neglect of and injuries to Resident.

117.    The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

      a. Chosen to disregard the duties and responsibilities which the Facility, as a licensed skilled nursing facility, owed to the State of Kansas and its residents;

     b. Created the dangerous conditions described by interfering with and causing the Facility to violate Kansas statutes, laws and minimum regulations governing the operation of said skilled nursing facilities;

     c. Superseding the statutory rights and duties owed to skilled nursing facilities residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility;

     d. Caused the harm complained of herein; and

     e. Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

**Count I - (Alter Ego Against Defendant Windward Health Partners)**

118.   Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

119.   Windward Health Partners is the corporate parent of Mission Health Communities. *See* 17-cv-01764-PAM-DTS, at Doc. 2; 3:20-cv-00439 at Doc. 10.

120.   Scott N. Feuer is a manager of Windward Health Partners.

121.   Bryan L. Crino is a manager of Windward Health Partners.

122.   Windward Health Partners is the sole member of Mission Health Communities.

123.   Mission Health Communities is a "portfolio" company of Windward Health Partners.

124.   Companies that private equity firms hold an interest in are considered portfolio companies. Investing in a portfolio company aims to increase its value and earn a return on investment through a sale.

125.   Windward Health Partners is the sole member of Coronado Operator.

126.   Coronado Operator is the sole member of EL DORADO.

127.  EL DORADO is so dominated by Windward Health Partners that EL DORADO is a mere instrument of Windward Health Partners and are indistinct from Windward Health Partners.

128.  In fact, EL DORADO is controlled and influenced by Windward Health Partners in that Windward Health Partners exercised complete control and domination over EL DORADO finances and business practices.

129.  Specifically, Windward Health Partners' complete control and domination over EL DORADO caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

130.  Upon information and belief, Windward Health Partners' complete control and domination over EL DORADO caused EL DORADO to operate at a loss during the years of 2021, 2022, and 2023.

131.  Upon information and belief, Windward Health Partners' complete control and domination over EL DORADO caused EL DORADO's liabilities to exceed its assets by during the years 2021, 2022, and 2023.

132.  Specifically:

    a.  Windward Health Partners own all or most of the capital stock of EL DORADO;

    b.  Windward Health Partners and EL DORADO have common directors or officers;

    c.  Windward Health Partners finance EL DORADO;

    d.  Windward Health Partners subscribe to all of the capital stock of EL DORADO;

    e.  Windward Health Partners caused the incorporation of EL DORADO;

    f.  The Facility has grossly inadequate capital;

g. Windward Health Partners pay the salaries and other expenses or losses of EL DORADO;

h. Windward Health Partners use the property of EL DORADO as its own; and

i. The directors or executives of EL DORADO do not act independently in the interest of EL DORADO but take their orders from Windward Health Partners in the latter's interest.

133. Thus, Windward Health Partners used the corporate cloak of EL DORADO as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that Windward Health Partners' complete control and domination of EL DORADO depleted all EL DORADO's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

134. This undercapitalization and understaffing violated EL DORADO's duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

135. As a direct and proximate result of the individual and collective acts of negligence as described above, Resident was harmed and suffered damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

136. As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

WHEREFORE, Plaintiff,, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable.

**Count II - (Alter Ego Against Defendant Stuart Lindeman)**

137.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

138.    Windward Health Partners is so dominated by Stuart Lindeman that Windward Health Partners is a mere instrument of Stuart Lindeman and are indistinct from Stuart Lindeman.

139.    In fact, Windward Health Partners is controlled and influenced by Stuart Lindeman in that Stuart Lindeman exercised complete control and domination over Windward Health Partners finances and business practices.

140.    Specifically, Stuart Lindeman's complete control and domination over Windward Health Partners caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

141.    Upon information and belief, Stuart Lindeman's complete control and domination over Windward Health Partners caused Windward Health Partners to operate at a loss during the years of 2021, 2022, and 2023.

142.    Upon information and belief, Stuart Lindeman's complete control and domination over Windward Health Partners caused Windward Health Partners' liabilities to exceed its assets by during the years 2021, 2022, and 2023.

143.    Specifically:

    a.    Stuart Lindeman owns all or most of the capital stock of Windward Health Partners;

    b.    Stuart Lindeman finances Windward Health Partners;

    c.    Stuart Lindeman subscribes to all of the capital stock of Windward Health Partners;

    d.   Stuart Lindeman caused the incorporation of Windward Health Partners;

    e.   The Facility — through Windward Health Partners — has grossly inadequate capital

    f.   Stuart Lindeman pays the salaries and other expenses or losses of Windward Health Partners;

    g.   Stuart Lindeman uses the property of Windward Health Partners as its own; and

    h.   The directors or executives of Windward Health Partners do not act independently in the interest of Windward Health Partners but take their orders from Stuart Lindeman in the latter's interest.

144.   Thus, Stuart Lindeman used the corporate cloak of Windward Health Partners as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that Windward Health Partners' complete control and domination of Windward Health Partners depleted all Windward Health Partners' assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

145.   This undercapitalization and understaffing violated EL DORADO's duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

146.   As a direct and proximate result of the individual and collective acts of negligence as described above, Resident was harmed and suffered damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

147.   As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

WHEREFORE, Plaintiffs, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable.

**COUNT III - (Pain and Suffering/Survival Claim v. All Defendants)**

148.   At all times material hereto, Resident was in a defenseless and dependent condition.

149.   As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

150.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

151.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

152.   These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

153.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

154.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

155.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

156.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

      a.   Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

      b.   Failing to adequately assess Resident's risk of developing pressure injuries;

      c.   Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

      d.   Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

      e.   Failing to turn and reposition Resident every two hours;

      f.   Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding pressure injury prevention;

      g.   Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injuries;

h. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injuries;

i. Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries;

j. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

k. Failing to prevent the development and worsening of Resident's pressure injuries;

l. Failing to timely report Resident's changes in condition to a physician;

m. Failing to carry out the instructions of Resident's physician;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of developing pressure injury;

o. Failing to timely transfer Resident to a Facility that could provide adequate care;

p. Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

q. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressure injuries in residents like Resident;

r. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's pressure injuries;

s. Failing to ensure the skilled nursing facilities was properly capitalized.

157.    Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

158.    As a direct and proximate result of the Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at Facility, Resident was harmed and suffered including pain, suffering, and mental anguish.

159.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

160.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

161.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2023 and 2024 created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

162.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

163.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

164.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff The Estate of Decedent prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

## Count IV (Wrongful Death against all Defendants)

165.    Plaintiff individually incorporates and references all preceding paragraphs as if fully set forth herein.

166.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

167.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

168.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

169.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

170.    These duties required Defendants to have sufficient and qualified staff at the Facility skilled nursing facilities to ensure the proper care for, and treatment of all residents including Resident.

171.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

172.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

173.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

   b.  Failing to adequately assess Resident's risk of developing pressure injuries;

   c.  Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

   d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

   e.  Failing to turn and reposition Resident every two hours;

   f.  Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding pressure injury prevention;

   g.  Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injuries;

   h.  Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injuries;

   i.  Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries;

   j.  Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

   k.  Failing to prevent the development and worsening of Resident's pressure injuries;

   l.  Failing to timely report Resident's changes in condition to a physician;

   m.  Failing to carry out the instructions of Resident's physician;

   n.  Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of developing pressure injury;

o.  Failing to timely transfer Resident to a Facility that could provide adequate care;

p.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

q.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressure injuries in residents like Resident;

r.  Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's pressure injuries;

s.  Failing to ensure the skilled nursing facilities was properly capitalized.

t.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

174.  As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

175.  As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiffs suffered non-economic damages including, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish

WHEREFORE, Plaintiff (individually), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including only non-economic damages

**<u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE</u>**

Respectfully Submitted,

STEELE LAW FIRM, II

*/s/ Jonathan Steele*
Jonathan Steele KS #24852/ MO #63266
2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on August 7, 2025 a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system to all parties and attorneys of record.

*/s/ Jonathan Steele*
Attorney for Plaintiff